IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

HELENA DIVISION

*******

STEVE K. McMORRAN,                          CV 05-12-H-CCL

    Plaintiff,

-v-

JO ANN BARNHART,
Commissioner of Social
Security,

    Defendant.


*******
OPINION & ORDER
*******

    The above-captioned civil matter is before the Court on the
parties' cross-motions for summary judgment.  The Court set the
matter for hearing on March 14, 2006, but the Court subsequently
granted Defendant's unopposed request for submission on the
briefs and record without oral argument.  Having now considered
the briefs and all the record in this case, the Court is prepared
to rule on the motions.

FACTUAL AND PROCEDURAL BACKGROUND:

    Plaintiff Steve K. McMorran ("McMorran") filed the Complaint

pursuant to 42 U.S.C. § 405(g) for judicial review of a final decision of Defendant Commissioner of Social Security Jo Ann Barnhart ("Commissioner").  The Complaint alleges that the Commissioner erroneously denied McMorran's application for Social Security disability benefits.

At the time of his Social Security hearing in 2004, McMorran was 50 years old.  He has about 1.5 years of college and no computer skills.  McMorran alleges that he is disabled due to the effect of the aging process on the symptoms resulting from two injuries suffered by him approximately twenty-five years ago.

McMorran suffered a low back injury on the job in 1981 when he worked for the City of Helena.  One year later in 1982, in another on-the-job accident while employed as a road worker by the City of Helena, McMorran was hit by a car.  This second accident resulted in the amputation of McMorran's left leg about three inches above the knee.

McMorran worked for the next twenty years, first for the City of Helena and then for the Montana Fish, Wildlife & Parks as an animal caretaker at the wildlife facility in Helena.  The Fish, Wildlife & Parks job was physically taxing, as it required

2

McMorran to lift bears and young elk, weighing 70 to 80 pounds, and entailed significant standing, bending, and crawling.  Prior to the injuries, McMorran also was an amateur athlete, and after the amputation he continued to play softball, racquetball, and golf for several years until he found that he could not keep up with those activities.  McMorran testified that he tried to do everything that he had done before, only it was hard to do and he was slower in doing it.  Eventually McMorran gave up such recreation, and he now occasionally swims and does back exercises.

In 2002, at age 48, after fourteen years working for Montana Fish, Wildlife, & Parks, McMorran resigned his position because he felt that his physical problems were too great, and he believed that the job exacerbated his symptoms and pain. McMorran testified that at the end of a workday he would come home physically exhausted, and that his right knee and hip (his good side) would be throbbing with pain.  McMorran testified that he suffered pain and symptoms for four or five years prior to quitting his job in 2002.

The problems McMorran reported having when previously

employed were chronic low back pain due to degenerative disc disease/degenerative arthritis, right knee pain (due to overcompensating for lack of a left leg), mild right hip degenerative arthritis, fatigue from use of the prosthesis, arthritis in distal joints, and psoriasis on his stump and leg. McMorran testified that psoriasis of his stump periodically caused severe pain and every month required him to abandon his prosthesis for crutches to allow the psoriasis to heal.  When McMorran could use the prosthesis regularly for work, his right knee and hip suffered pain due to his overcompensating for the lack of a left leg.  At all times, McMorran testified, he also suffered low back pain from the back injury.

After the Social Security hearing in 2004, McMorran attempted to return to work for several months at the Montana Grizzly Encounter in Bozeman, Montana.  McMorran fed bears, cleaned cages, and performed light maintenance.  However, he suffered an attack of psoriasis that caused him to miss work for several weeks.  Upon his return to work, McMorran thereafter needed to sit down to perform some of his tasks.  To accommodate him and his inability to perform his previous tasks, the employer

gave McMorran a new position as gatekeeper, but the job was shortly thereafter terminated for lack of attendance at the exhibit.

McMorran testified that at home he uses his crutches to ambulate and he tries to avoid lifting and carrying.  He occasionally uses his prosthesis for only short periods of time (not for full days).  He rests after any activity of an hour or two.  He uses Advil for pain and has been on amytriptyline for several years for depression.  He uses prescription creams for psoriasis, and sometimes cortisone injections when the creams are ineffective.  McMorran's symptoms are corroborated by his treating doctors.

Larry Rowan ("Rowan"), vocational expert, testified at the hearing that McMorran could not return to his past relevant work and that he could not perform any work on an eight-hour per day, five day per week basis.  Rowan also testified, however, that McMorran could perform light duty and sedentary positions, such as teacher's aide, small parts assembler, and information clerk.

LEGAL STANDARD:

The Social Security Act defines "disability" to mean an

> (A) inability to engage in any substantial gainful
> activity by reason of any medically determinable
> physical of mental impairment which can be expected to
> result in death or which has lasted or can be expected
> to last for a continuous period of not less than 12
> months....

42 U.S.C. § 423(d)(1)(A).  The statute further provides that the

physical or mental impairment must be so severe that the

individual

> is not only unable to do his previous work but cannot,
> considering his age, education, and work experience,
> engage in any other kind of substantial gainful work
> which exists in the national economy....

42 U.S.C. § 423(d)(2)(A).

McMorran carries the initial burden of showing that he is

disabled.  *See Hoffman v. Heckler*, 785 F.2d 1423, 1424 (9th Cir.

1986).  If that burden is carried, the burden then shifts to the

Commissioner to show that the claimant can perform other, less

demanding substantial gainful work which exists in the national

economy.  *Hoffman*, 785 F.2d at 1425.  The Commissioner's decision

must be upheld if it is supported by substantial evidence and

properly applied legal standards.  *Delgado v. Heckler*, 722 F.2d

570, 572 (9th Cir. 1983).  Substantial evidence is "such relevant

evidence as a reasonable mind might accept as adequate to support

6

a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1979). On review, this Court must consider the record as a whole, weighing both the evidence that supports and detracts from the Commissioner's conclusion. *Green v. Heckler*, 803 F.2d 528, 530 (9th Cir. 1986).

Social Security regulations prescribe a five-step sequential evaluation process to decide whether an individual is disabled. "If we can find that [the claimant is] disabled or not disabled at a step, we make our determination or decision and we do not go on to the next step.  If we cannot find that [the claimant is] disabled or not disabled at a step, we go on to the next step." 20 C.F.R. § 404.1520(1)(4).  The steps are as follows:

(1)   consider whether the individual is doing substantial gainful activity;

(2)   consider the medical severity of the impairment and whether it meets the duration requirement (and if not a finding of no disability will result);

(3)   consider whether an impairment meets or equals a listing in appendix 1 of subpart P and meets the duration requirement (and if so a finding of disability will result);

(4)   consider the Commissioner's assessment of the individual's residual functional capacity and past relevant work (and if the individual can still do the

7

past relevant work a finding of no disability will
result); and

(5)   consider the individual's residual functional capacity
and his age, education, and work experience, to
determine whether the individual can make an adjustment
to other work (if so, a finding of no disability will
result–if not, a finding of disability will result).

*See* 20 C.F.R. § 404.1520(a)(4)(i)-(v).  The burden of proof is on

the claimant as to steps one through four.  *Tackett v. Apfel*, 180

F.3d 1094, 1098 (9th Cir. 1999).

ADMINISTRATIVE LAW JUDGE'S DECISION:

The Administrative Law Judge ("ALJ") determined that,

despite a severe impairment, McMorran retained a Residual

Functional Capacity ("RFC") to perform light or sedentary work

(work involving lifting or no more than 20 pounds at a time with

frequent lifting or carrying of objects weighing up to 10

pounds).  In reviewing McMorran's work history, the ALJ

determined that McMorran could not return to his past relevant

work as a wildlife care attendant, but the ALJ also determined

that there are significant number of other jobs in the national

economy for which McMorran has sufficient RFC. In summary, the

ALJ determined that McMorran was not disabled at step five of the

8

analysis.

DISCUSSION:

McMorran argues that the Commissioner ought to have decided the question of disability in his favor at step three, because McMorran believes that his impairment matches Listing 1.05B of the Listing of Impairments in Appendix 1 of subpart P.  The Listing of Impairments includes at 1.05B any musculoskeletal impairment resulting from amputation of

> [o]ne or both lower extremities at or above the tarsal region, **with stump complications resulting in medical inability to use a prosthetic device to ambulate effectively**, as defined in 1.00B2b, which have lasted or are expected to last for at least 12 months....

20 C.F.R. Subpt. P, App. 1, § 1.05B (emphasis added).  The ability to ambulate effectively is defined as follows:

> (1) *Definition.*  Inability to ambulate effectively means an extreme limitation of the ability to walk; *i.e.*, an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities.  Ineffective ambulation is defined generally as having **insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities**. (Listing 1.5C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)

9

(2) *To ambulate effectively*, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living.  They must have the ability to travel without companion assistance to and from a place of employment or school.  Therefore, **examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes,** the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.  The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. Subpt. P, App. 1, § 1.00B2b (emphasis added).  McMorran argues that the administrative law judge ("ALJ") erred at step three when the ALJ failed to consider that his stump psoriasis prevents him from wearing his prosthesis regularly and that he therefore must rely on crutches.  McMorran argues that his amputation combined with his psoriasis equals the Listed Impairment 1.05B, which means that the inquiry should conclude in his favor at step three.  McMorran also makes the alternative argument that at step five the ALJ erred by failing to take into account his inability to wear a prosthesis when determining his

Residual Functional Capacity, or RFC.

Defendant Commissioner responds that the ALJ was entitled to discount the credibility of McMorran's pain claims regarding the stump psoriasis and McMorran's inability to wear a prosthesis on a daily basis for a job.  The ALJ states that "[t]he claimant's allegations of total disability are not credible, nor supported by the medical records."  A.R. 21.  The ALJ states that McMorran "has not had a stump sore that needed a doctor's care for about five years."  A.R. 22.  The ALJ gives "little weight" to the report of a dermatologist that McMorran had a flare-up of psoriasis that spread to about 30% of his body surface.  A.R. 23. The ALJ concludes that McMorran's allegation of total disability is not credible.  A.R. 23.  The ALJ cites the following reasons why he disbelieves McMorran's testimony regarding pain:

> He is very able and active.  He is able to do all manner of household domestic chores.  He can shop for groceries and walk about town.  He can even do light carpentry activities and plant trees (which first entails digging a hole).  He can swim, which he does regularly.  As recently as early 2003 he was playing racquetball.  He can drive an automobile.  He has had very little treatment for any condition since his alleged onset of disability.  He does not use prescription pain medication, and his use of over-the-counter analgesics is sparing.  He gets good relief from depression from amitriptyline.  His psoriasis is

> well controlled with a cream, and those exacerbations
> are "far and few between" anyway.  The claimant has not
> pursued vocational rehabilitation, and he has not been
> looking for employment.  Actually, he has little
> financial incentive to do work since he has an after
> tax income of $3,100 a month from his annuity.

A.R. 23.  However, the Court has a number of questions about

these explanations and the resulting credibility determination,

mainly after review of the supplemental evidence that came into

the record after the ALJ's decision on March 29, 2004.  The Court

believes that had the ALJ been given the benefit of this

supplemental evidence, the ALJ might have decided differently.

    Looking only at the pre-decision record, the ALJ discounted

and gave little weight to McMorran's treating physician, Dr.

Goldes, a dermatologist who had stated in February 2004 that

> [McMorran's] psoriasis flared globally and involved up
> to 30% of the body surface area. ... Thus, this patient
> has the potential and experience of a chronic relapsing
> skin disease which when involving much of his body
> surface, causes impairment. ... Please accept this
> letter a statement in support of Mr. McMorran's request
> for Social Security evaluation disability as part of
> his disability spectrum.

A.R. 160.  A few months after the ALJ's decision, however, Dr.

Goldes had an opportunity to work with McMorran again because

McMorran made an attempt to return to work and the daily use of

his prosthesis on the job caused another flare of psoriasis.
This next flare up kept McMorran out of work for three weeks and
sent him back to Dr. Goldes approximately ten times (in that
three week period) for treatment.  *See* A.R. 162-66.  The
photographs taken by Dr. Goldes of McMorran's stump psoriasis
provide clinical evidence that supports McMorran's testimony of
pain and inability to wear his prosthesis on a regular basis.
*See* A.R. 167-70.

    The Court also notes that a post-decision statement by
McMorran underscores the severity of his psoriasis and the great
impact it has on his functioning:

> P.S.  To whom it may concern.
> As of 25th day of Nov. 2004 I had cleared the psoriasis
> of my stump to nearly 100% after nearly 2½ months of
> not being able to wear my prosthesis the day came I
> decided it was time to put the prosthesis back on.
> After the months of not being in my prosthesis my leg
> changed its shape and wearing the prosthesis was very
> painful.  I indured this pain throughout the day hoping
> it would re-shape itself.  The next day my stump was
> extremely sore.  I decided that I probably needed to
> take the prosthesis in for re-shaping to fit my newly
> formed stump.  Well I don't need to do that any time
> soon because wearing the prosthesis for that day
> brought on another psoriasis attack.  So, instead of
> going to the Prosthetics guy to have a refit I get to
> go back to the psoriasis guy!!  Ain't Life Grand.  My
> last bout (2½ month) of psoriasis have been a different

13

> kind of psoriasis there called corpusqular (sp)
> psoriasis.  They come in the form of large pimples or
> boles filled with pus!!  They are very sensetive to the
> touch and when something like clothing is rubbed
> against them they become inflammed.  My last outbreak
> and this recent outbreak are located in my crotch (both
> sides) and between my buttocks.  So, when I walk or as
> of late crutch around the psoriasis get extremely sore
> from the constant rubbing.  If you can find me a job as
> a fish I'll take it.  Thanks for your time. Steve.

A.R. 179-80.

Influenced, no doubt, by this post-decision evidence, the
Court has a number of concerns about the credibility
determination in the decision.  First, McMorran testified that he
takes care of his household chores *on crutches* and that he avoids
using the prosthesis most days.  McMorran has never alleged that
he cannot use a prosthesis at all.  Rather, he has asserted that
he uses it sparingly in order to accomplish tasks that simply
cannot be performed without it, and then he takes it off in order
to prevent an outbreak of psoriasis.  Thus, he can shop for
groceries, walk short distances, perform light carpentry, and
plant a tree.  McMorran testified, however, that he uses his
crutches for yard work and gardening.  McMorran testified that he
uses his prosthesis to perform activities that absolutely require

14

it, and then he immediately takes it off to avoid irritating the stump.  *See* A.R. 197.

Although McMorran was an athlete before his amputation and even as an amputee, McMorran testified that he has had to give up playing racquetball a few years before 2004:

> I played softball.  I golfed.  I played racquetball.  I tried to do everything I did before; it just was a lot harder, a lot slower.  I think probably in those years that didn't help the situation that much.  You know, I just tried to live a normal life, and up until a few years ago, I put an end to all that stuff.  It, it also was takings its toll on me.

A.R. 195-96.

The only mention in the record about McMorran playing racquetball in 2003 is this treatment note by a physical therapist on March 4, 2003:

> Steve notes a decrease in his activity.  He retired from the Fish and Game last summer due to hip and back discomfort with his work activities.  He states that he has also been unable to play racquetball secondary to knee and occasional hip pain.

A.R. 112.  This treatment note is unclear when McMorran last played racquetball.  In addition, McMorran doesn't need two legs to swim or drive an automobile, and these activities do not undermine his credibility.

15

As for the psoriasis, there is no evidence in the record that McMorran's psoriasis is controlled by a cream.  Rather, the evidence shows that McMorran uses a cream daily, but controls his psoriasis *by taking off his prosthesis and keeping it off until the psoriasis heals*.  The "exacerbations" that are occasional are extreme flare-ups of psoriasis that spread over large swaths of his body and require medical treatment with lancing, antibiotics, and cortisone shots.  But McMorran's testimony was that the psoriasis on his stump is a daily problem that is never really controlled except by taking his prosthesis off and resorting to crutches:

> I have nerve ending pains that are, that are – they are 24 hours a day.  I have, on the end of my stump where it rubs at the bottom of the prosthesis – there is continual rubbing in there, and I have psoriasis, and at the end of that stump, psoriasis, likes to attack areas that are vulnerable, and with the end of that stump rubbing back and forth there, I can get psoriasis that are probably an inch in circumference, or whatever, and they can be very painful because there is constant rubbing on there, and it, it just kind of rubs it raw.  I mean you know if I treat them, they will go away, but it is a very vulnerable spot for like psoriasis.  As a matter of fact, I think this last outbreak that I had of psoriasis was caused by, by my amputation down there or the rubbing in the prosthetic device....  I, I take it off if it gets too bad.  I've had sores.  I get a lot of sores in [the groin area].

16

> I try to work through them, but they have gotten to the
> point where I've had them to where, I mean, they are
> like golf ball size, and they fill up with puss, and I
> have actually had to go and have them lanced by a
> physician.  That's, that's been a while ago, but I
> still – in the rubbing and the constant pressure, the
> hot spots, there's almost – I'm almost battling with a
> sore just about every day. ... If I want to go through
> the pain, I can wear [the prosthesis].  I prefer to
> take it off and let it heal up before I put my leg back
> on. ... I have not worn my prosthesis up to two and
> three days trying to get rid of sores that have
> accumulated in, in the area – in that area. ... I would
> say, I'm out of my, out of my prosthetic device for
> healing purposes of these sores, oh, maybe a few times
> a month to get them healed up. ... Two or three times a
> month where I can actually – would want to take my leg
> off to heal them up, you know like the type of person
> that I am sometimes I just kinda try to work my way
> through it, and that is probably not the best thing to
> do because it, it is kinda like a vicious circle.  If
> I, if I, if I wear the prosthetic, it gets worse, and I
> – it's kinda an ongoing thing.  I, I – it would be best
> for me to take it off and, and for them to heal up.

A.R. 188-90.  McMorran did testify that the last time he had to

go to a doctor to have a sore drained was 5-6 years earlier.

A.R. 207.  But he also explained that the only way to avoid

getting to that point was to take his prosthesis off and keep it

off until the psoriasis healed.

    As part of the credibility findings, the ALJ reports that

> [t]he claimant's prosthetist states that the claimant
> is 'still active' and 'is not sedentary by any means.'
> The prosthetist further states that the claimant uses

17

his prosthesis every day, which is contrary to the
claimant's testimony that there are several days a
month when he does not use it. (Exhibit 9F)

A.R. 22.   However, the prosthetist stated as follows:

I have been fitting and fabricating prosthetic
appliances for our patient for nearly 20 years.
Throughout that time frame I have noticed that Steve
has been gradually slowing down in his level of
activity.  Mr. McMorran has gone from an extremely
active, hardwearing user to a user who, while still
active, does not require the durability in his
appliance that he once did.  The breakdown rate in his
appliance that resulted from very hard use has also
decreased.

Steve has required no revision of his residual limb and
uses his prosthetic device on a daily basis.  He is not
sedentary by any means, but his lifestyle has slowed
down considerably. ...

... There have been numerous studies conducted,
however, regarding the energy consumption required by
an amputee who wears a prosthetic device.  These
studies indicate that people who wear below knee
prosthetic appliances increase their energy consumption
by a range of 10 to 40 percent over than of an able-
bodied person.  For a transfemoral (above knee)
amputee, that energy consumption increases
dramatically; the resulting gait deviation and the
added stress and effect of this deviation to the
skeletal system would adversely affect Mr. McMorran's
activity level.

A.R. 159.  Although the prosthetist asserts that McMorran uses

his prosthesis on a daily basis (which is not the same as "uses

18

it every day"), the prosthetist does not say for *how long (minutes or hours)* McMorran uses the prosthesis on a daily basis, nor does the prosthetist explain *how he knows this to be true*.

Finally, the ALJ also gives little credibility to McMorran's testimony regarding his subjective pain and psoriasis problem because McMorran receives $3,100 each month from an annuity, which the ALJ believes has reduced McMorran's motivation to work. However, the $3,100 monthly payment from the annuity did not diminish McMorran's motivation to work during 20 years of employment.  It would seem that there has to be another logical explanation than lack of motivation for McMorran's decision to quit working after 20 years on the job.

Thus, viewing the credibility determination in light of the supplemental evidence, a number of the explanations appear to be considerably weaker than they might have appeared without post-decisional evidence.

The ALJ can reject McMorran's pain testimony and testimony regarding inability to wear the prosthesis upon a finding of "affirmative evidence" of malingering or by expressing "clear and convincing reasons" for doing so.  *Smolen v. Chater*, 80 F.3d

19

1273, 1283-84 (9th Cir. 1996).  However, the ALJ has not presented any evidence of malingering nor clear and convincing reasons for discrediting McMorran's testimony.  McMorran's ability to manage his household and to carry on the basic activities of living does not undercut his credibility:

> [T]he mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from [his] credibility as to [his] overall disability.  One does not need to be utterly incapacitated in order to be disabled.

*Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001) (internal quotations omitted).  Indeed, "many home activities are not easily transferable to ... the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication."  *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).  The law does not require disability claimants to be "penalized for attempting to lead normal lives in the face of their limitations."  *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998).

On this record, the ALJ"s reasons for rejecting McMorran's testimony are not substantial enough to meet the "clear and

convincing" standard when balanced against McMorran's medical history of stump problems that prevent him from wearing his prosthesis.  Moreover, in rejecting the evidence of treating physician Dr. Goldes, the ALJ did not provide specific legitimate reasons supported by substantial evidence in the record.  *See Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995).

To be fair to the ALJ, much of the evidence this Court finds persuasive was supplied after, not before, the ALJ made his decision.  Nevertheless, the Court is persuaded by (1) the photographs and treatment notes of Dr. Goldes, A.R. 162-170, (2) McMorran's statements, A.R. 174, 179-80, and (3) the statement of the employer, A.R. 176, that McMorran's inability to stand on his prosthesis and inability to work at all while the stump was healing entered into the employer's decision to terminate McMorran's employment.

The record as a whole now appears to provide substantial evidence that McMorran's combined impairments equal Listing 1.05B and that McMorran's RFC is substantially reduced by his inability to wear the prosthesis due to psoriasis of his stump.  The Court believes that these are issues that ought to be addressed by the

21

ALJ, after allowing the Commissioner to be heard, and perhaps after obtaining "an updated medical judgment for medical equivalence," SSR 96-6P, 1996 WL 3741807 (S.S.A.), and a new RFC evaluation.

Accordingly,

IT IS HEREBY ORDERED that the Commissioner's Motion for Summary Judgment is DENIED and McMorran's Motion for Summary Judgment is GRANTED.

IT IS FURTHER ORDERED that the case is REMANDED to the Commissioner for further proceedings in light of the reasonable possibility of a judgment of medical equivalence to a listed impairment and, in the alternative, for the ALJ to pose a hypothetical to the vocational expert that takes into account McMorran's psoriasis condition and the pain, symptoms, and limitations to which McMorran credibly testified.  *See DeLorme v. Sullivan*, 924 F.2d 841, 850 (9th Cir. 1991).

The Clerk is directed forthwith to notify counsel of the entry of this Order.

DATED this 13th day of April, 2006.


CHARLES C. LOVELL
SENIOR UNITED STATES DISTRICT JUDGE